**Opinion issued July 23, 2026.**



In the

# Court of Appeals

for the

# First District of Texas

_____

## NO. 01-24-00668-CR

_____

**XAXIER JAWIN HOWARD, Appellant**

**v.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 351st District Court**
**Harris County, Texas**
**Trial Court Case No. 1756207**

---

### MEMORANDUM OPINION

Appellant Xavier Jawin Howard was charged by indictment with the murder of his mother-in-law, Tammy Mouton. A jury found appellant guilty of that offense, and the trial court sentenced him to 45 years' imprisonment. Appellant argues on appeal that the trial court erred in admitting causation evidence related to

a fire that the State accused appellant of starting to cover up Mouton's murder. But even if the trial court erroneously permitted the expert to provide what appellant characterizes as unreliable testimony regarding the origin of the fire that the jury may have interpreted as testimony regarding the cause of the fire, such testimony did not affect appellant's substantial rights given other overwhelming evidence of appellant's guilt. We affirm the trial court's judgment.

## Background

At the time Mouton was killed, she lived with her daughter Crystal, her daughter's husband Xavier (i.e., appellant), and the couple's two children, Alaya and Alayria. Alaya was 10 years old and Alayria was 8 years old. Appellant claims that, on the night of January 6, 2022, he and Crystal argued and Crystal left the house to spend the night with a friend. Appellant claims that he then put his daughters to bed and also left the house, at around 10:00 p.m.

On January 6 and 7, 2022, surveillance cameras in the area recorded: (1) appellant arriving at his house the evening of January 6 in a light-colored van, wearing a red hoodie and dark-colored pants; (2) appellant leaving the house shortly before 10:00 p.m. that night, in a light-colored van bearing a distinctive sticker on the front windshield; (3) around 3:15 a.m., the same van being parked around the corner from appellant's house, and a man wearing a red hoodie and dark-colored pants exiting the van and walking in the direction of appellant's

2

house; (4) the same man approaching appellant's house and walking toward a gate on the side of the house; (5) around 4:58 a.m., a fire at the front corner of appellant's house; (6) around 5:00 a.m., a man in a red hoodie and dark-colored pants leaving from the side of appellant's house, walking back to the parked van, and driving away; and (7) around 5:07 a.m., the same van pulling into the driveway of appellant's house and appellant exiting the van wearing only dark-colored pants.

Around 5:00 a.m. the morning of January 7, 2022, appellant's next-door neighbors Cindy and Omar Gomez awoke to discover that appellant's house was on fire. From outside her home, Cindy called Crystal, then 9-1-1. Omar and a second neighbor attempted to determine if anyone was inside appellant's house. Soon after Cindy hung up with 9-1-1, appellant arrived at his house in his van. Appellant, Omar, and the second neighbor sought to rescue those trapped inside the burning house. The second neighbor soon emerged from the house carrying Alayria, whom he handed off to Cindy. Appellant then said he was going to drive his van "through the garage" in an attempt to reach Alaya. Soon after appellant crashed his van into the garage, the second neighbor came out of the burning house carrying Alaya and handed her to Cindy. As Cindy cared for the girls, appellant came to hug them. Appellant told Cindy that Mouton was still in the house and, around the same time, firefighters arrived at the scene. Alayria and Alaya were injured in, but survived, the fire.

While some firefighters fought fire in front of the house, others entered the back of the house to look for Mouton. There was zero visibility. Firefighters found Mouton and carried her outside, where a paramedic took over. One of the firefighters who carried Mouton out of the house testified that her body felt abnormally "[s]lick," as if "the body had some type of petroleum-based product that had been poured on the upper extremities." At some point while Mouton's body was still laying in the front yard of the burning house, it was determined that she was deceased. Mouton's external injuries, which were documented by photographs introduced at trial, included burns and a "cut or laceration or abrasion" on her head, which had blood on it. In the kitchen of the house, near where Mouton's body had been discovered, a firefighter found a "metal sauce pan" that "had been damaged through some blunt force."

A team from the Harris County Fire Marshal's Office—Sergeant Oscar Castiblanco, Lieutenant James Singleton, Sergeant Eddie Tesiere, and Investigator Jonathan Benavides—was on the scene on January 7, 2022. Castiblanco was tasked with the fire investigation and began his work at 6:30 a.m. that morning. He was accompanied by his supervisor, Singleton. Benavides assisted Castiblanco with taking photographs. Tesiere had with him a dog trained to locate accelerants, and the dog located no accelerants at the scene. Castiblanco ultimately concluded that

4

the fire began in or near a sofa at the front of the house, in a north corner of the house near a window.[1]

On January 25, 2022, appellant was questioned by the Sheriff's Department. Appellant acknowledged that he had been driving a van on January 6, 2002, that was similar in appearance to the van seen in the surveillance camera recordings. But appellant said that, after leaving his house shortly before 10:00 p.m. on January 6, he spent the night in his van at a Walmart parking lot. After the interview, outside the sheriff's Department, a sheriff's deputy arrested appellant for the murder of Mouton and placed him in handcuffs. Appellant then attempted to flee on foot, forcing the arresting officer to chase and tackle him, but was recaptured shortly thereafter.

**Admission of Unreliable Expert Testimony**

In his sole issue on appeal, appellant claims that the trial court erred in admitting unreliable expert testimony from Sergeant Castiblanco on the cause of the fire in which Mouton's body was discovered. During trial, but outside the jury's presence, the trial court held an evidentiary hearing regarding the scope of expert testimony that Castiblanco would be permitted to give. At the end of the

---

[1] When asked at trial where the fire had started, Castiblanco testified: "It was directly by that area that you see the corner [sic], the window, like I refer to the north area of the home where there was a loveseat that was located there." Castiblanco testified that the loveseat "was down to its mechanical functions, the metal framework itself." When asked the follow-up question, "[a]nd is that why you believe it's the point of origin for the fire," Castiblanco responded, "I do."

hearing, the trial court ruled that Castiblanco could testify as to the origin of the fire, but not as to whether the fire was intentionally set.

On appeal, appellant complains of the trial court's admission of testimony by Castiblanco that, as characterized by appellant:

- "established the fire's point of origin by ruling out the kitchen, bedrooms, and other areas, concluding that the fire originated in the front living room/foyer area, where a loveseat had been reduced to its metal frame," which appellant argues was significant because "the fire's starting point could indicate whether it was accidental or intentionally set";

- "determined that no electrical malfunctions or appliance failures were responsible";

- "confirmed that there were no accelerants detected by the K9 unit, weakening potential defenses related to accidental ignition by flammable liquids";

- "testified that the fire's intensity and burn patterns were consistent with a fire that started at the loveseat and spread outward rather than from an accidental household source";

- "[i]n support of the State's narrative, . . . testified the pattern of fire damage in the home aligned with potential human actions (e.g., something being placed or ignited near the loveseat) rather than an unavoidable event";

- stated that "the absence of typical accidental fire indicators, such as electrical arcing or malfunctioning outlets, further eliminated common alternative explanations";[2]

---

[2]     As discussed below, Castiblanco testified that he had considered and rejected a number of possible origin points for the fire, but did not characterize any rejected hypothesis as the rejection of a possible accidental cause, much less say that he had rejected all possible accidental causes of the fire. *See infra* note 6.

- "opined that discrepancies in the fire's progression and missing objects suggested that items may have been deliberately removed before or during the fire"; and

- "artificially strengthened the State's case" by (1) "explain[ing] how heat and smoke traveled, leading him to determine that the living room fire was the strongest and first to ignite," (2) "describ[ing] how broken windows and oxygen flow could have intensified the fire in a way that suggested human intervention rather than an accidental, slow-building fire," and (3) making "observations on the victim's burn patterns and injuries [that] suggested she was already in the home when the fire started, a critical element in determining potential intent."

Appellant argues that these opinions were unreliable for reasons including that Castiblanco conducted an incomplete inspection, relied on his visual observations and assumptions rather than physical tests to confirm his hypothesis that the fire started in the sofa,[3] did not give adequate weight to evidence that did not support his hypothesis, failed to investigate or test possible alternative sources of the fire, and prepared an incomplete written report.

## A.    Standard of Review

"A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the

---

[3]    *See* NAT'L RSCH. COUNCIL, STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES: A PATH FORWARD 173 (2009) ("Experiments should be designed to put arson investigations on a more solid scientific footing."). In its "Path Forward" report, the National Research Council, part of the National Academy of Sciences, "sought to examine the scientific bases underlying various forensic disciplines" and "concluded that many of the scientific principles underlying forensic sciences used in the courtroom are unproven, or that experts have been overstating the probative value of their analyses of forensic evidence." *Ex parte Chaney*, 563 S.W.3d 239, 257 n.34 (Tex. Crim. App. 2018).

expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." TEX. R. EVID. 702. To satisfy this standard for scientific knowledge, the expert's scientific knowledge must be reliable. *Null v. State*, 690 S.W.3d 305, 311 (Tex. Crim. App. 2024). "Reliability of expert opinion about scientific knowledge is assessed in different ways depending on whether the expert opinion is about a hard or soft science." *Id.* If an expert's testimony is based on "a hard science involving precise calculations and the scientific method," the expert must satisfy the reliability test set forth in *Kelly v. State*, 824 S.W.2d 568 (Tex. Crim. App. 1992). *Rhomer v. State*, 569 S.W.3d 664, 671 (Tex. Crim. App. 2019) (citing *Kelly*, 824 S.W.2d at 573). Under the *Kelly* reliability test: "(1) the underlying scientific theory must be valid, (2) the technique applying the theory must be valid, and (3) the technique must have been properly applied on the occasion in question." *Id.* (citing *Kelly*, 824 S.W.2d at 573).

The erroneous admission of expert testimony is non-constitutional error that requires reversal only if it affects appellant's substantial rights. TEX. R. APP. P. 44.2(b) (stating non-constitutional error "that does not affect substantial rights must be disregarded"); *Flores v. State*, No. 01-19-00273-CR, 2020 WL 4689229, at *8 (Tex. App.—Houston [1st Dist.] Aug. 13, 2020, pet. ref'd) (mem. op., not designated for publication) (citing *Barshaw v. State*, 342 S.W.3d 91, 93 (Tex.

8

Crim. App. 2011)). In assessing the likelihood that the jury's decision was improperly influenced by the erroneous admission of expert testimony, we consider the record as a whole, including testimony and physical evidence, the nature of the evidence supporting the verdict, and the character of the alleged error and how it might be considered in connection with other evidence in the case. *Flores*, 2020 WL 4689229, at *9 (citing *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002)). Factors we may consider include: (1) the strength of the evidence of appellant's guilt; (2) whether the jury heard the same or substantially similar admissible evidence through another source; (3) the strength or weakness of an expert's conclusions, including whether the expert's opinion was effectively refuted; and (4) whether the State directed the jury's attention to the expert's testimony during argument. *Id.* (citing *Motilla*, 78 S.W.3d at 355). "Even in cases in which credibility is paramount, Texas courts have found harmless error when the inadmissible expert testimony was only a small portion of a large amount of evidence presented that the jury could have considered in assessing the victim's credibility." *Barshaw*, 342 S.W.3d at 96.

**B.     Harm Analysis**

Assuming without deciding that the trial court erroneously permitted Sergeant Castiblanco to provide what appellant characterizes as unreliable testimony regarding the origin of the fire that the jury may have interpreted as

9

testimony regarding the cause of the fire, we conclude that the testimony did not affect appellant's substantial rights.

In her closing argument, counsel for the State focused heavily on surveillance camera footage of appellant's house and neighborhood, and evidence regarding the condition of Mouton's body. Counsel referenced Castiblanco's testimony three times as part of that argument:

- While playing a video of appellant backing his van into his garage the day before the fire, counsel for the State mentioned that Castiblanco had testified that someone could have removed things from the walls of the house during the fire. However, counsel made the reference only as an aside while emphasizing that Singleton, i.e., Castiblanco's supervisor, had testified that "a lot of times people remove things *prior* to a fire" and that "it could have happened *before* the fire."[4] (Emphasis added.)

- While showing the jury a video of someone the State argued was appellant walking toward appellant's house at around 4:00 a.m. on the night of the fire, counsel stated: "He's walking toward his home where his children peacefully sleep and mother-in-law lies on the sofa, where Castiblanco tells you he believes is the ignition point."

- Just before making a second reference to Castiblanco's testimony that the "sofa" was the ignition point, counsel for the State suggested that Castiblanco testified that he made a comprehensive search for evidence that

---

[4]     Counsel stated: "This is [appellant] backing into his garage. And you-all remember Singleton said that a lot of times people remove things prior to a fire. I'll grant you, Castiblanco said it happened -- could have been happened during the fire. Singleton said it could have happened before the fire. What do you suppose he's backing in for? Think it's a reasonable deduction that he's loading those things that he took off the wall, right then and there? I submit to you that it is."

the fire was accidentally set and found none,[5] which is a mischaracterization of Castiblanco's testimony.[6]

There was evidence at trial that Mouton lived in the front part of the house, in the corner room where the sofa was located. Castiblanco was the only witness who testified at trial that the fire started in or near the sofa. But we disagree with appellant's contention that Castiblanco's testimony was "critical to the final conviction because it established the location and possible cause of the fire" because, even assuming the ignition point and possible cause of the fire was a critical part of the State's case, Castiblanco's testimony was not the only evidence at the trial regarding where the fire had started. Surveillance camera footage shown at trial shows flames start to emerge from the house in the early hours of January 7, 2022, at the front of the house, in the same corner where Castiblanco testified the

---

[5]     Counsel argued: "What happened? Did somebody accidentally set [the house] on fire? Did the Christmas tree set it on fire? What did Castiblanco tell you? He looked at everything. He checked. He looked at the wires. He looked at the ar[c]ing. He didn't see it. Did he map it all out? No, he did not map it all out. What was the ignition point? He told you the sofa."

[6]     Castiblanco testified that he had considered and rejected a number of possible origin points for the fire, such as a kitchen appliance, electrical wiring, and a light fixture. However, consistent with the trial court's ruling that he could not testify as to whether the fire was intentionally set, he did not characterize any rejected hypothesis as the rejection of a possible accidental cause, much less say that he had rejected all possible accidental causes of the fire. *See Johnson v. State*, No. 14-15-00834-CR, 2016 WL 7018204, at *3 (Tex. App.—Houston [14th Dist.] Dec. 1, 2016, pet. ref'd) (mem. op., not designated for publication) (noting that "negative *corpus delicti*," i.e., "the process of concluding that a fire was intentionally set based on the absence of evidence of an accidental cause," is a "methodology [that] has been widely criticized as being inconsistent with the scientific method").

fire started. And interior photographs of the house introduced at trial showed extensive fire damage in the same area at the front of the house and only smoke, soot, and water damage in other parts of the house.

Moreover, in his cross-examination of Castiblanco, appellant's counsel elicited testimony touching on many of the issues that appellant now cites in arguing that Castiblanco's testimony was unreliable. For example, while appellant argues that Castiblanco's testimony "determined that no electrical malfunctions or appliance failures were responsible," Castiblanco acknowledged on cross-examination that other objects in the room with the sofa were potential ignition sources, and that an electrical appliance could have started the fire. He also testified that he had not tested the breakers at the house or the kitchen stove.

Appellant asserts that the State's case absent Castiblanco's testimony was "weak" and that only Castiblanco's testimony connected the fire to Mouton's death. To the contrary, the State's other evidence at trial that appellant murdered Mouton, including evidence that appellant set fire to his house in an attempt to cover up the murder, was compelling. The evidence that Mouton was murdered included evidence that:

- Mouton suffered significant blunt force trauma to her head and mouth, multiple hemorrhages of her neck muscles, and hemorrhaging of her tongue.

- The trauma to Mouton's mouth knocked out her tooth.

- Mouton died from asphyxia caused by external compression of her neck. She had petechiae in her eyes and lower lip caused by the neck compression. Petechiae can last two to three days.[7]

- Mouton had deep burn marks on just one of her legs and only superficial burns on her arms and chest.

- The color of Mouton's burned skin was consistent with post-mortem thermal injuries.

- The inhalation of carbon dioxide produced by a thermal source was not a contributing factor in Mouton's death.

The evidence connecting appellant to Mouton's murder and the fire was equally strong. As noted above, that evidence included surveillance camera footage showing: (1) appellant arriving at his house the evening of January 6 in a light-colored van, wearing a red hoodie and dark-colored pants; (2) appellant leaving the house shortly before 10:00 p.m. that night, in a light-colored van bearing a distinctive sticker on the front windshield; (3) around 3:15 a.m., the same van being parked around the corner from appellant's house, and a man wearing a red hoodie and dark-colored pants exiting the van and walking in the direction of appellant's house; (4) the same man approaching appellant's house and walking toward a gate on the side of the house; (5) around 4:58 a.m., a fire at the front corner of appellant's house; (6) around 5:00 a.m., a man in a red hoodie and dark-colored pants leaving from the side of appellant's house, walking back to the

---

[7] While the State's experts did not opine on the precise time of Mouton's death, there was no evidence at trial that Mouton had suffered any significant blunt force trauma to her head prior to the night of January 6, 2022.

parked van, and driving away; and (7) around 5:07 a.m., the same van pulling into the driveway of appellant's house and appellant exiting the van wearing only dark-colored pants. As counsel for the State noted in her closing argument, as she played the video of the man in a red hoodie and dark-colored pants leaving the house at around 5:00 a.m. and passing within a few feet of the flames engulfing the home's front corner, he appears to take no notice of the fire.

Counsel concluded her closing argument by reminding the jury that, shortly after appellant was arrested, he ran from a sheriff's deputy while handcuffed. *Franklin v. State*, 976 S.W.2d 780, 782 (Tex. App.—Houston [1st Dist.] 1998, pet. ref'd) (noting that appellant's escape from custody evidenced consciousness of guilt).

For these reasons, even if the trial court erroneously permitted Sergeant Castiblanco to provide what appellant characterizes as unreliable testimony regarding the origin of the fire that the jury may have interpreted as testimony regarding the cause of the fire, such testimony did not affect appellant's substantial rights. *See O'Brien v. State*, 482 S.W.3d 593, 618 (Tex. App.—Houston [1st Dist.] 2015) (holding that any error in admission of expert testimony did not warrant reversal where other evidence of appellant's guilt was substantial, expert's testimony was weakened on cross-examination, and State's closing argument did not heavily rely upon expert's testimony, which was just one of many things that

State argued connected appellant to crime), *aff'd*, 544 S.W.3d 376 (Tex. Crim. App. 2018).

We overrule appellant's sole issue.

## Conclusion

We affirm the trial court's judgment.

Amparo "Amy" Guerra
Justice

Panel consists of Chief Justice Adams and Justices Guerra and Guiney.

Do not publish. TEX. R. APP. P. 47.2(b).